IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| JEFF J. SILER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | 5:04-CV-399 (CAR) |
| | : | |
| HANCOCK COUNTY BOARD | : | |
| OF EDUCATION, | : | |
| | : | |
| Defendant. | : | |
| | AND | |
| JEFF J. SILER, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | 5:05-CV-0139 (CAR) |
| | : | |
| HANCOCK COUNTY SCHOOL | : | |
| DISTRICT d/b/a HANCOCK COUNTY | : | |
| BOARD OF EDUCATION; MR. HERBERT | : | |
| MONROE, CHAIRMAN, INDIVIDUALLY | : | |
| AND IN HIS OFFICIAL CAPACITY; MR. | : | |
| MELVIN SMITH, INDIVIDUALLY AND IN | : | |
| HIS OFFICIAL CAPACITY; MS. RUBY | : | |
| CLAYTON, INDIVIDUALLY AND IN HER | : | |
| OFFICIAL CAPACITY; MS. FELICIA | : | |
| STEWART, INDIVIDUALLY AND IN HER | : | |
| OFFICIAL CAPACITY; MS. DENISE | : | |
| RANSOM, INDIVIDUALLY AND IN HER | : | |
| OFFICIAL CAPACITY, DR. FLORENCE | : | |
| REYNOLDS, SUPERINTENDENT, | : | |
| INDIVIDUALLY AND IN HER OFFICIAL | : | |
| CAPACITY; MR. TYRONE A. EVANS, | : | |
| INDIVIDUALLY AND IN HIS OFFICIAL | : | |
| CAPACITY, | : | |
| | : | |
| Defendants. | : | |

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.    INTRODUCTION

Plaintiff Dr. Jeff Siler ("Siler") instituted this action against the Hancock County School District ("District") d/b/a Hancock County Board of Education ("Board"), and District employees Mr. Herbert Monroe, Chairman; Mr. Melvin Smith; Ms. Ruby Clayton; Ms. Felicia Stewart; Ms. Denise Ransom; Dr. Florence Reynolds, Superintendent; and Mr. Tyrone Evans, in their individual and official capacities.  Siler, a school administrator formerly employed by the District, alleges Defendants discriminated against him based on his gender and age and retaliated against him, in violation of 42 U.S.C. § 1983, the Age Discrimination in Employment Act[1] ("ADEA"), and Title VII of the Civil Rights Act of 1964[2] ("Title VII").  Siler further alleges Defendants violated his rights guaranteed by the First and Fifth Amendments, and asserts various claims arising under Georgia law.  Before this Court is Defendants' Motion for Summary Judgment (doc. 72).  After a thorough review of the record and the relevant law, the Court concludes that Defendants are entitled to summary judgment on Siler's federal claims.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

Siler began his employment with the District as an assistant principal in August

---

[1] The ADEA is codified in 29 U.S.C. § 621, *et seq.*

[2] Title VII is codified in 42 U.S.C.A. § 2000e, *et seq.*

1991, and he retained this position until July 1992. Between July 1992 and December 1992, Siler served as the principal of Hancock Central High School ("HCHS" or "high school"). In January 1993, Siler once again became an assistant principal, and he remained in this role until July 1995, when he once again assumed the principalship of the high school. On November 8, 1995, Siler became the high school's assistant principal, where he remained until June 2002. In July 2002, Siler became an assistant principal at the District's middle school. Approximately one year later, Siler became the Director of the District's alternative school. This appointment was short-lived, however. The next month, on August 20, 2003, the Board, on the recommendation of the interim Superintendant, Nicholas Antone ("Antone"), appointed Siler once again to the principalship of the high school. (Defs.' Br. Supp. Mot. Summ. J., doc. 72, at 5 n.3.)

Approximately one month after Siler's August 2003 appointment, his working relationship with Antone, his immediate supervisor, began to deteriorate. (Antone Aff. ¶ 4; Siler Dep. 46-47.) According to Siler, his relationship with Antone soured when Antone started "misspeaking things [during Board meetings], and trying to make [Siler] look bad." (Siler Dep. 47.) Siler believed that Antone was trying to discredit him because Antone wanted Siler's job, and because he was envious of Siler's performance as principal. (*Id*. at 52-53.) Antone admits that he and Siler had a strained relationship; however, he attributes the strain to Siler's repeated attempts to make <u>him</u> look bad by, for example, "correct[ing]

him" in front of the Board, undermining him in administrative staff meetings, and resisting his directives. (Antone Aff. ¶ 4.) Toward the end of 2003, the relationship between Siler and Antone had deteriorated to such an extent that, "it appeared to [Antone] that Dr. Siler was either incapable or unwilling to accept [his] directives as interim superintendent." (*Id.*)

On January 11, 2004, Antone learned that Delphine Skinner ("Skinner"), a female employee working under Siler's immediate supervision, had recently filed a sexual-harassment suit against Siler. (Antone Aff. ¶ 5.) Upon learning this information, Antone immediately directed Jeanette Giles ("Giles"), the District's Director of Exceptional Education and Coordinator of Sexual Harassment, to investigate the allegations. (*Id.*) Antone also offered to transfer Skinner to a different secretarial position within the District. (*Id.* at ¶ 6.) Skinner initially accepted Antone's offer, but within two weeks she resigned. (*Id.*) In February 2004, Skinner offered to settle her claims against the District for $6,000.00. (*Id.* at ¶ 5.) Antone presented Skinner's offer to the Board, and recommended that the Board approve the offer as a "cost avoidance" measure. (*Id.* at ¶ 7.) Antone did not, at that time, make any representations regarding the strength of Skinner's claims or the status of Giles's investigation. (*Id.*) The Board authorized the settlement. (*Id.*)

During Giles's investigation, which took place between February and March 2004, three present or former District employees (including Skinner) indicated to Giles that Siler

had made inappropriate (and unwelcome) sexual advances or comments toward them. (Giles Aff. ¶¶ 5-7.) When Giles confronted Siler with these allegations, Siler allegedly claimed that the allegations were borne of "employment or personally related animus." (*Id.* at ¶ . 7.) According to Giles, Siler further stated that he had never before been accused of sexual harassment, and pointed to a number of co-workers who could vouch for his good character. (*Id.* at ¶ 5.)

After speaking with Siler, Giles discovered information indicating that Siler had, on at least two prior occasions, been accused of sexual harassment. The first incident "related to a lawsuit allegedly filed against the Board of Education in 1992 as the result of allegations of sexual harassment [against] Dr. Siler." (*Id.* at ¶ 8.) "The other related to a former employee, Ms. Joan Fountain, who was identified in the investigation as a former employee who was propositioned by Dr. Siler." (*Id.*) On March 18, 2004, Antone and Giles met with Siler to discuss these two incidents. During the meeting, Siler "asserted that Ms. Fountain had never complained of any remarks that he made to her until the present day." (*Id.*) Siler "also asserted that a lawsuit in 1992 was filed against the Board of Education and while it 'mentioned' him and the principal, he was not the employee's supervisor." (*Id.*)

At the end of March 2004, Giles concluded her investigation and presented her findings to Antone. (Antone Aff. ¶ 9.) Giles's main findings concerned the three female employees who were allegedly harassed by Siler. (*Id.*) Because Antone was ultimately

responsible for recommending a proper course of action to the Board, Antone personally interviewed the females identified by Giles. (*Id.*)

On April 13, 2004, Antone recommended the nonrenewal of Siler's contract as HCHS principal to the Board.[3] (Antone Aff. ¶ 12.) After interviewing Siler and Williams, Antone concluded that Siler likely had, at minimum, made inappropriate remarks to Williams, and this factor, along with Siler's continued "inappropriate communications with [Antone], parents, employees, and students" and his resistance to Antone's directives, formed the bases for Antone's decision. (*Id.*) At the time Antone recommended Siler's nonrenewal as principal, he had not yet determined whether he would pursue a termination hearing for Siler. (*Id.*) In substance, Antone's decision not to recommend Siler's renewal as principal foreclosed Siler from placement in this position by the Board; however, if Antone did not bring charges against Siler or if Siler was cleared of the charges, Antone intended to place him in another administrative position in the District. (*Id.* at ¶ 13.)

When Antone informed Siler that he had recommended that the Board not renew Siler's HCHS principal contract for the next school year, Siler apparently interpreted Antone's decision as a termination of his employment with the District. (*Id.* at ¶ 14.) In no time, Siler's attorney requested a termination hearing and information relating to the

---

[3] Georgia law requires decisions regarding employment placement for the upcoming school year to be made by April 15 of that same year. O.C.G.A. § 20-2-211(b).

investigation. (*Id.* at ¶ 22.) Because Antone's investigation into Skinner's allegations was still ongoing at that time, Antone denied Siler's attorney's request for the investigatory materials as premature.

By early May 2004, Antone completed his independent investigation. Though Antone concluded that Williams's allegations against Siler were "probably valid," and he "believed that [Siler] had also engaged in inappropriate communications with Ms. Skinner," Antone was nonetheless "uncertain as to whether [Siler] was guilty of the most serious accusations [Skinner] brought against him." (*Id.* at ¶ 15.) Due to Antone's uncertainty regarding the veracity of Skinner's accusations, he decided to present the charges to the Board and allow the Board "as a factfinder," to determine who was "telling the truth." (*Id.*) Antone did not reveal his intention to "anyone other than the Board's attorney." (*Id.*)

Later on in May, Antone learned that "Dr. Siler was aggressively seeking an administrative position outside the District." (*Id.* at ¶ 16.) Around this time, Antone also learned that the District was facing a potentially "tremendous cut in state funding." (*Id.*) Seeking to avoid a "costly termination and appeal" with respect to Siler, Antone decided to either ask Siler to tender his resignation, or to recommend that he return to the District's alternative school and undergo proper training. (*Id.*)

On June 7, 2004, Siler, his attorney, Antone, and the Board's attorney met to mediate

the charges against Siler.[4]  (*Id.* at ¶ 17.)  Antone informed Siler that he believed Siler "probably was guilty of at least one of the charges against him and if he agreed to resign or voluntarily accept a transfer to a 'lead teacher' position at the Hancock County Alternative School and receive proper training in appropriate communications," Antone was willing to forgo "a Board hearing in which [he] would likely recommend [Siler's] discipline, up to and including termination of his employment."  (*Id.*) Siler evidently construed Antone's suggestion as a threat to fire him, even though Antone, as Superintendent, did not have the unilateral authority to do so.  (*Id.*; Compl., doc. 1, at ¶ 4.)  Siler also rejected Antone's proposed transfer to the alternative school, stating "he would only accept a transfer to an assistant principal position."  (Antone Aff. ¶ 17.) Unfortunately, on the date of the mediation, there were no assistant principal vacancies, though vacancies subsequently opened in mid-to-late June.  (*Id.*)  Following the parties' unsuccessful mediation attempt, Antone prepared to proceed with a termination hearing. (*Id.* at ¶ 18.)

Sometime before June 7, 2004, Antone learned that Skinner had challenged the validity of the settlement and waiver she had previously entered into with the District.

---

[4] Though the parties initially agreed that all matters discussed during the mediation would remain confidential, Siler arguably breached this agreement by alleging Antone made certain statements during the meeting—principally, that he threatened to "fire [Siler]" if he did not resign—and making this and other accusations a central part of his case.

(*Id.*)  Skinner's settlement challenge "raised questions in [Antone's] mind regarding her ability to be a witness" at a termination hearing for Siler, so, rather than pursuing a termination hearing, Antone decided to recommend Siler's placement as a lead teacher of the alternative school.[5]  In Antone's view, the lead teacher position was an administrative position "of equivalent authority to the [high school] principalship," but one that would minimize Siler's interaction with female employees.  (*Id.* at ¶¶ 18-19.)  By late June 2004, Antone believed he and Siler had reached a compromise wherein Siler agreed to serve as the alternative school's lead teacher and to undergo "appropriate communications training."  (*Id.* at ¶ 19.)

On July 1, 2004, Dr. Florence Reynolds ("Reynolds") succeeded Antone as the Superintendent of the District.  (Reynolds Aff. ¶ 2.)  Shortly thereafter, Reynolds discovered both that the principalship of the high school had not been filled, and that Siler, the former principal, was serving as the alternative school's lead teacher.  (*Id.* at ¶ 3.)  Roughly two or three weeks after Reynolds took over as Superintendent, Siler appeared at the District's office, "visibly irate," and "literally yelling about his mistreatment by the Board."  (*Id.* at ¶ 4.)  At that time, Siler explained to Reynolds that the District had

---

[5] Whether Antone or Reynolds (or both) recommended, and Siler ultimately accepted, the position of "lead teacher" or "director" of the alternative school is a hotly disputed issue of fact.  For purposes of this Order, the Court assumes, as it must at this stage of the proceedings, that Siler was appointed to the lead teacher position at the alternative school.  *See **Reeves v. Sanderson Plumbing Prods., Inc.**,* 530 U.S. 133, 150 (2000).

wrongfully denied his request for a hearing on the sexual-harassment charges asserted against him earlier that year. (*Id.*) After her conversation with Siler, Reynolds contacted the District's attorney, Mr. Mike Dishman ("Dishman"), and "informed him of Siler's outburst." (*Id.*) Through her conversation with Dishman, Reynolds learned that, prior to leaving, Antone recommended that Siler be reassigned as the lead teacher of the alternative school, and that Siler's outburst may have been a reaction to the recent breakdown in his ongoing negotiations with the Board "about the scope of [his] duties and whether he would participate in mandatory appropriate communications training." (*Id.* at ¶ 4.)

On July 21, 2004, Reynolds recommended that the Board appoint Siler as the lead teacher of the District's alternative school.[6] (*Id.* at ¶ 5.) Reynolds believed the lead teacher position to be comparable to that of a principalship in terms of prestige, responsibility, and salary. (*Id.* at ¶¶ 5, 14.) As a lead teacher, Siler purportedly received a 200-day contract,[7] reported directly to Reynolds, and supervised "other District-level 'at-risk' student programs." (*Id.* at ¶ 5.)

While Siler negotiated the terms of his new contract, an interview panel evaluated

---

[6] *See* n.5, *supra.*

[7] In August 2004, Siler requested a ten-and-a-half month contract (200 work days), insisting that, as a tenured assistant principal, he was entitled to a contract of this length. (Reynolds Aff. ¶ 9.) Reynolds found this request to be somewhat unusual in light of the fact that, in Georgia, "educator contracts have standard lengths of one hundred ninety days (ten month[s]), two hundred twenty days (eleven month[s]), or two hundred and forty days (twelve month[s])." (*Id.*) Nonetheless, in order to ensure that Siler did not suffer a decrease in pay after his transfer, Reynolds agreed to give Siler a 200-day contract. (*Id.*)

candidates for the high school principalship. Ultimately, the panel recommended to Reynolds and the Board that Stephanie Birdsong ("Birdsong") succeed Siler as high school principal. (*Id.* at ¶ 21.) Reynolds and the Board subsequently accepted the panel's recommendation, and the Board appointed Birdsong to the high school principalship. (*Id.*)

Siler assumed his new responsibilities at the alternative school on or about August 1, 2004. Almost immediately, problems arose between Reynolds and Siler. (*Id.* at ¶ 6.) Reynolds claims that Siler often left the school without following sick-leave protocol, that Siler was looking for other employment, that Siler felt his new position was beneath him, and that, against Reynolds's directive, Siler "frequently suspend[ed] students" for minor infractions. (*Id.* at ¶¶ 6, 8.)

At the end of August, Siler complained to Reynolds that he was not compensated for the work he performed that month. (*Id.* at ¶ 9.) Reynolds found Siler's complaint to be somewhat perplexing because, in the District, ten-month employees typically did not receive their first compensation for a new school year until the end of September, while eleven and twelve-month employees were compensated at the end of each month (with a one-month delay for eleven-month employees). Although Siler had a ten-and-a-half month contract, he technically was not an eleven or twelve-month employee; thus, he was not, in Reynolds's view, entitled to compensation at the end of August. (*Id.*) Nonetheless, at Siler's insistence, Reynolds directed Mr. Tyrone Evans, an accountant for the District, to

remit a paycheck to Siler, with the understanding that Siler's checks would not be prorated over the school year, and he would receive his final check by May 2005. (*Id.* at ¶ 10.) On Monday, September 6, 2004—four working days after his salary inquiry—Siler received his paycheck for August 2004 in the amount of $6,872.42. (*Id.*)

On October 1, 2004, Siler informed Reynolds that he wished to retire from the District as soon as possible, and provided Reynolds with a letter dated September 17, 2004, indicating the same. (*Id.* at ¶ 11; Letter, Siler Dep. Ex. D.) Reynolds conveyed Siler's retirement request to the Board during a meeting held on October 4, 2004. (Reynolds Aff. ¶ 11.) The Board approved Siler's request at the meeting, but on October 5, 2004, Reynolds received another letter from Siler in which he stated that, while he wished to retire, he did not wish to resign his current post. (*Id.* at ¶ 12.)

On November 23, 2004, Siler, proceeding *pro se,* filed the instant action in this Court. (Compl., doc. 1.) Siler subsequently retained counsel to represent him in this matter. Following a lengthy discovery period, Defendants moved for summary judgment on August 3, 2006.

## III.    SUMMARY JUDGMENT STANDARD

The summary-judgment rule exists "to isolate and dispose of factually unsupported claims or defenses." ***Celotex Corp. v. Catrett***, 477 U.S. 317, 323-24 (1986). Summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c) (West 2005); *see also **Celotex Corp.***, 477 U.S. at 322. A genuine issue of material fact necessary to defeat a properly supported motion for summary judgment arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 248 (1986). In reviewing a motion for summary judgment, a court must review all the evidence in the record while "draw[ing] all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." ***Reeves***, 530 U.S. at 150; *see also **Maynard v. Williams***, 72 F.3d 848, 851 (11th Cir. 1996).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and entitle it to a judgment as a matter of law. ***Celotex Corp.***, 477 U.S. at 323 (internal quotation marks omitted). If the moving party discharges this burden, the burden shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact (i.e., evidence that would support a jury verdict) or that the moving party is not entitled to a judgment as a matter of law. *See* Fed. R. Civ.

P. 56(e); ***Celotex Corp.***, 477 U.S. at 324-26.  This evidence must consist of more than mere

conclusory allegations or legal conclusions.  *See **Avirgan v. Hull***, 932 F.2d 1572, 1577 (11th

Cir. 1991).  Under this scheme, summary judgment must be entered "against a party who

fails to make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial." ***Celotex Corp.***,

477 U.S. at 322.

## IV.    LEGAL DISCUSSION

### A.    Gender Discrimination Claims under Title VII

Siler asserts two interrelated gender-discrimination claims.  First, Siler claims that

Defendants discriminated against him based on his gender by not renewing his contract

for the principalship of the high school in April 2004, and hiring a female to replace him.

 (Siler Dep. 211.)  Second, Siler claims that Defendants also discriminated against him by

not appointing him as principal of Southwest Elementary School in June 2004.   (*Id.*)

Title VII plaintiffs "bear the burden of proving that the[ir] employer[s] discriminated

against them unlawfully." ***Hinson v. Clinch County, Ga. Bd. of Educ.***, 231 F.3d 821, 827

(11th Cir. 2000).  Proof of discrimination may be established through either direct or

circumstantial evidence.  Direct evidence, unlike circumstantial evidence, "is that which

shows an employer's discriminatory intent 'without any inference or presumption.'" ***Id.***

(quoting ***Standard v. A.B.E.L. Servs., Inc.***, 161 F.3d 1318, 1330 (11th Cir. 1998)).  Here, Siler

offers, at most, circumstantial evidence to support his gender-discrimination claims. Accordingly, the Court will evaluate these claims under the "circumstantial evidence" framework first applied in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

Under the *McDonnell Douglas* framework, Siler bears the initial burden of presenting "sufficient evidence to allow a reasonable jury to determine that he has satisfied the elements of his prima facie case of gender discrimination." *See id.* Once he has done so, the burden shifts to Defendants "to articulate some legitimate, nondiscriminatory reason" for its employment decision(s). *Id.* At that point, Siler must "be afforded a fair opportunity to show" that Defendants' reason(s) were pretextual. *Id.* at 804.

The Court will first address whether Siler has established a prima facie case of gender discrimination with respect to his nonrenewal as high school principal.

**1. Siler's Nonrenewal as HCHS Principal**

**(a) Prima Facie Case**

As stated above, Siler believes that Defendants' decisions not to renew his contract for the HCHS principal position and to hire a female to succeed him were the result of Defendants' gender-based animus toward him. To establish a prima facie case of gender discrimination, Siler must show four things: (1) that he was a member of a protected class, (2) that he was qualified for the job, (3) that he suffered an adverse employment action, and (4) that he was replaced by someone outside the protected class. *Hinson*, 231 F.3d at 828.

The parties do not dispute that Siler was qualified to serve as a principal (a position he had held, off and on, for roughly three years), or that he was replaced by a woman. Defendants claim, however, that Siler suffered no adverse employment action.

"Determining whether an employment action is adverse for purposes of Title VII is a matter of federal, not state, law." *Id*. at 828-29. "[A] transfer can constitute an adverse employment action for Title VII purposes, even if under state law the transfer is not considered a demotion." *Id.* at 829. In the context of Title VII, "a transfer to a different position can be adverse if it involves a reduction in pay, prestige <u>or</u> responsibility." *Id.* (emphasis added) (internal quotation marks omitted). This Circuit employs an objective test to determine whether the employment action was adverse, "asking whether 'a reasonable person in [the plaintiff's] position would view the employment action in question as adverse.'" *Id.* (quoting *Doe v. Dekalb County Sch. Dist.*, 145 F.3d 1441, 1448 (11th Cir. 1998)).

The Court's first task is to compare the alternative school position with the principal position to determine whether Defendants' transfer of Siler was an adverse employment action. As previously noted, Siler contends that Defendants appointed him to the "lead teacher" position at the alternative school, not the "director" position, as Defendants contend. (Pl.'s Br. Supp. Mot. Summ. J., doc. 81, at 72-28.) Siler further contends that his transfer was a demotion because the lead teacher position was not equivalent in terms of

pay, prestige, or responsibility to that of a principalship.  Defendants, on the other hand,

claim that Siler's reassignment to the alternative school was not a demotion because Siler

received a pay increase, and, as "director," he remained an administrative employee who

reported directly to the Superintendent.  The parties vehemently disagree as to whether

Siler's reassignment resulted in a pay decrease.

At a minimum, Siler has created a genuine issue of material fact as to whether he

was reassigned to be a "lead teacher" at the alternative school, rather than the "director,"

as Defendants contend.  (*See* Defs.' Br. 11; Goss Aff. ¶ 3; Antone Aff. ¶ 17; Siler Dep. 129;

Pl.'s Br. 27-28.)  Accepting Siler's contention as true, as the Court must, the Court finds that

a reasonable person could easily conclude that a "lead teacher" position offers less prestige

and responsibility than a principal's job.   *See **Hinson***, 231 F.3d at 829 ("Teachers work

under the direction and supervision of their principals and are subject to their discipline.").

Because Siler's version of the facts establishes that his transfer to the alternative school

resulted in a loss of prestige and responsibility, the Court concludes that Siler has

established a prima facie case of gender discrimination.

**(b) Legitimate, Nondiscriminatory Reason/ Pretext**

Siler's proof of a prima facie case of gender discrimination creates a presumption

that Defendants discriminated against him.  *See **St. Mary's Honor Ctr. v. Hicks***, 509 U.S.

502, 506 (1993).  Defendants attempt to rebut this presumption by asserting several

nondiscriminatory reasons for not renewing Siler's contract for the high school principalship: (1) Siler's "poor communication skills with students, parents, and staff"; (2) Superintendent Antone's "conclusions regarding the investigations of allegations of sexual harassment brought against [Siler]"; and (3) the numerous parental complaints the District received regarding Siler's "performance as principal." (Defs.' Br. 17-18.) Defendants' enumerated reasons for not renewing Siler's contract are more than sufficient to satisfy their burden of producing a legitimate, nondiscriminatory reason for Siler's nonrenewal.

Because Defendants have met their burden, "'the presumption raised by the prima facie case is rebutted . . . and drops from the case.'" *St. Mary's*, 509 U.S. at 507 (quoting *Texas Dep't. of Cmty Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). At this point, Siler must produce evidence sufficient to enable a factfinder to conclude that Defendants' stated reasons "'were not [their] true reasons, but were a pretext for discrimination.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Burdine*, 450 U.S. at 253). "Provided that the proffered reason is one the might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. A1 Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000).

Siler has not met his final evidentiary burden, as he has made <u>no</u> showing that Defendants' reasons for not renewing his high school principal contract were pretextual.

As Defendants correctly point out, Siler's "only effort to call into question [Defendants'] proffered reasons for his nonrenewal consist of (1) denying the truthfulness of the facts upon which Mr. Antone's concerns were based and (2) a undifferentiated and non-specific attack on the performance of his ultimate replacement, Ms. Stephanie Birdsong." (Defs.' Br. 18.) Indeed, much of Siler's "proof" centers around whether he was in fact guilty of the sexual-harassment allegations, the insubordination, and the communication issues that apparently fueled his transfer. This "proof" alone is insufficient to demonstrate pretext because the Court's inquiry under the third prong of the *McDonnell Douglas* test is limited to whether Defendants *believed* that Siler was guilty of the sexual-harassment allegations, the insubordination, and the communication issues, and, if so, whether these beliefs were the reasons behind Siler's nonrenewal. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) (citing *Hawkins v. Ceco Corp.*, 883 F.2d 977, 980 n.2 (11th Cir. 1989)).

"Federal courts 'do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers,'" Title VII does not interfere. *Id.* (quoting *Mechnig v. Sears, Roebuck & Co.*, 864 F.2d 1359, 1365 (7th Cir. 1988)). Rather, the court's "inquiry is limited to whether the employer gave an honest explanation of its behavior." *Id.*; *see also Smith v. Papp Clinic, P.A.*, 808 F.2d 1449, 1452-53 (11th Cir. 1987) ("[I]f the employer fired an employee because it honestly believed

that the employee had violated a company policy, even if it was mistaken in such belief, the discharge is not 'because of race' and the employer has not violated § 1981."); ***Moore v. Sears, Roebuck & Co.***,683 F.2d 1321, 1323 n.4 (11th Cir. 1982) ("For an employer to prevail the jury need not determine that the employer was correct in its assessment of the employee's performance; it need only determine that the defendant in good faith *believed* plaintiff's performance to be unsatisfactory.").

Here, Siler has offered no evidence to show that Defendants' proffered justifications for his nonrenewal are unworthy of credence. With respect to the sexual-harassment allegations against Siler, Defendants certainly were permitted to transfer Siler to a position that minimized his contact with female employees if they believed him to be guilty of sexual harassment. If Defendants did nothing in the face of such a belief, they would have run "a serious risk of incurring Title VII liability to those employees harassed." *Elrod*, 939 F.2d at 1470. Siler does not dispute that Antone interviewed the women complaining of harassment, or that Antone believed at least some of the allegations to be true, and partially based his recommendation of nonrenewal on this belief. Nor has Siler offered any substantially probative evidence that his gender more likely than not motivated Defendants' decision to not renew his contract.

To the extent that Siler points to his co-workers' favorable affidavit testimony (regarding, inter alia, his work ethic, his character, his good relationship with his

supervisors, his students, and their parents) to show Defendants' lack of credence, this argument is rejected. The fact that Siler's co-workers never observed him engage in the conduct Defendants complained of is not evidence that Defendants did not believe the conduct occurred when Siler's co-workers were not around to see it. *See id.* at 1471 n.3.

In sum, "[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [an employer] has offered . . . evidence of legitimate, non-discriminatory reasons for its action." *Carter v. Miami*, 870 F.2d 578, 585 (11th Cir. 1989). Because Siler offered no probative evidence to rebut Defendants' proffered reasons for his nonrenewal, Siler has not met his burden of establishing pretext; thus, there is no jury question as to this issue. Accordingly, Defendants' summary-judgment motion with respect to Siler's gender discrimination claim based on his nonrenewal is hereby **GRANTED**.

### 2. Defendants' Failure to Hire Siler for Other Administrative Positions

Siler also contends that Defendants' refusal to hire him for other administrative openings following his nonrenewal as high school principal was motivated by Defendants' gender-based animus toward him.

In a failure-to-hire case based on circumstantial evidence of gender discrimination, courts apply the *McDonnell Douglas* burden-shifting framework. To establish a prima facie case of gender discrimination in a failure-to-hire case, the plaintiff must show: (1) he

is a member of a protected class, (2) he was qualified for a position *and applied for it,* (3) he was not considered for the position despite his qualifications, and (4) equally or less qualified individuals outside of his protected class were considered or hired for the position. ***Underwood v. Perry County Comm'n***, 431 F.3d 788, 794 (11th Cir. 2005) (emphasis added) (internal citations and quotation marks omitted). "The prima facie case creates a rebuttable presumption that the employer acted illegally." ***Id.*** (citation omitted). "'At that point, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for [not hiring] the plaintiff . . . If the employer does so, the burden shifts back to the plaintiff to introduce significantly probative evidence showing that the asserted reason is merely a pretext for discrimination.'" ***Id.*** (quoting ***Zaben v. Air Prods. & Chems., Inc.,*** 129 F.3d 1453, 1457 (11th Cir. 1997)).

**(a) Prima Facie Case**

Defendants do not dispute that Siler is a member of a protected class, or that he was qualified for the principal or Superintendent positions available in the District after his contract was not renewed. Defendants claim, however, that a critical piece of Siler's prima-facie puzzle is missing: his job applications.

That Siler <u>never applied</u> for any of the administrative positions he now claims he was denied is uncontroverted. (Siler Dep. 108, 160-61.) The only possible way for Siler to circumvent the application requirement is to prove that his failure to apply for these

positions was due to, for example, the District's informal hiring practices, or to the fact that job opportunities were not regularly posted. *See **Carmichael v. Birmingham Saw Works**,* 738 F.2d 1126, 1132 (11th Cir. 1984); ***Harris v. Birmingham Bd. of Educ.***, 712 F.2d 1377, 1383 (11th Cir. 1983). This Siler cannot do. Siler admits that the District formally advertised, posted, and solicited applications for these positions, and that he nonetheless failed to apply for them. (Siler Dep. 205-207.) Siler's only explanation for his failure to apply for an advertised assistant principal position was that Antone told him during the June 7 mediation that no assistant principal positions were available. (Siler Dep. 65.) Siler concedes, however, that sometime after the mediation, assistant principal vacancies arose, and the District publicly advertised and solicited applications for these positions. (Siler Dep. 205-207; Ex. S.) Siler's conclusory assertions that he was under no legal obligation to apply for administrative vacancies, and that Defendants had a duty to appoint him to a vacant position for which he did not apply, are, quite simply, without merit. (Siler Dep. 101.)

Accordingly, having failed to apply for any administrative openings advertised between April and July 2004, Siler cannot demonstrate a prima facie case of gender discrimination based on the District's failure to hire him for these positions; therefore, Defendants are entitled to summary judgment on this gender-discrimination claim, as well.

**B.      Age Discrimination Claims under the ADEA**

Siler also claims that Defendants' failure to appoint him to either of the two vacant assistant principal positions available in June 2004 was due to his age. According to Siler, Defendants hired two males[8] under the age of 40 to fill those positions. Here, too, Defendants assert that Siler's age-discrimination claim is foreclosed by the fact that he failed to apply for either assistant principal vacancy. (Defs.' Br. 20-21.)

Cases based on circumstantial evidence of age discrimination are governed by the *McDonnell Douglas* burden-shifting framework. To establish a prima facie case of age discrimination, the plaintiff must show: (1) he is over the age of 40, (2) he suffered an adverse employment action, i.e. he was not hired or promoted, (3) he was replaced by a younger person, and (4) he was qualified for the position for which he was rejected. *Chapman*, 229 F.3d at 1024. Once the plaintiff establishes a prima facie case of discrimination, the burden shifts to the employer to provide a "legitimate, nondiscriminatory reason for its actions." *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir. 1998). If the employer satisfies its burden of production, the burden shifts back to the plaintiff, who must then establish that the employer's proffered reason was a "pretext to mask unlawful discrimination." *Id.* In this final step, the plaintiff carries the "ultimate burden of establishing by a preponderance of the evidence that a discriminatory intent motivated the employer's action." *Crawford v. Johnson*, 133 Fed.

---

[8] These individuals were later identified as Marcus Morris and Willie Gibson. (Defs.' Br. 21.)

Appx. 674, 675 (11th Cir. 2005).

### 1. Prima Facie Case

Defendants do not dispute that Siler is a member of a protected class of individuals (i.e. individuals over the age of 40), or that Siler was not ultimately hired for either of the assistant principal vacancies that arose in June 2004. Rather, Defendants assert again that, because Siler did not apply for either of the assistant principal vacancies, his age-discrimination claim fails as a matter of law. (Siler Dep. 101-103.) The Court agrees.

"A general interest in being rehired without submitting an application is not enough to establish a prima facie case of age discrimination when the defendant-employer has publicized an open position." *Smith v. J. Smith Lanier & Co.*, 352 F.3d 1342, 1345 (11th Cir. 2003). Here, Siler admittedly knew of the assistant principal vacancies, but he chose not to formally apply for either available position; thus, he cannot establish a prima facie case of age discrimination. *See id.* Accordingly, Defendants' summary-judgment motion with respect to Siler's age-discrimination claim is hereby **GRANTED.**

### C.   First and Fifth Amendment Claims

Next, Siler contends Defendants violated his First Amendment right to free speech and his Fifth and Fourteenth Amendment rights to due process by refusing to provide him a hearing on his alleged demotion and the correlating sexual-harassment charges. (Siler Dep. 60.) Defendants claim no constitutional violation occurred because, "under

applicable federal and state law, [Siler] had no right to appear and address" the Board at a regular meeting "to advance his personal, work-related grievances." (Defs.' Br. 27.)

The Court's first task is to identify the constitutional right(s) actually at issue in this case. Though Siler alleges he was deprived of his First Amendment right to free speech, it is clear that the actual constitutional violation complained of stems from Defendants' alleged deprivation of his due-process rights. (*See* Pl.'s Resp. Br. 34.) Moreover, despite the fact that Siler alleges a Fifth Amendment due-process violation, the law clearly dictates that Siler's claims should be analyzed solely under the rubric of the Fourteenth Amendment. Because the Fifth Amendment's due-process clause applies only in the context of constitutional deprivations alleged against federal actors, and because Siler has alleged no participation by federal actors in the constitutional deprivations outlined in his Complaint, Siler's reliance on the Fifth Amendment is misplaced. ***Ward v. C.I.R.***, 608 F.2d 599, 601-02 (5th Cir. 1979)[9]; *see also **Bartkus v. Illinois***, 359 U.S. 121, 124 (1959). Nevertheless, the Court will address Siler's Fourteenth Amendment claim as it relates to Defendants' failure to afford him procedural due process prior to his alleged demotion.

"The due-process clause [of the Fourteenth Amendment] provides that the rights to life, liberty, and property cannot be deprived except pursuant to constitutionally adequate

---

[9] In ***Bonner v. City of Prichard***, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to October 1, 1981.

procedures." ***Hatcher v. Bd. of Pub. Educ. & Orphanage***, 809 F.2d 1546, 1548-49 (11th Cir. 1987). Siler's entitlement to procedural due process—namely, a hearing to address his alleged demotion and the sexual-harassment charges—depends, in part, on whether Siler had a property interest in his continued employment as a tenured school administrator. ***Id.*** at 1549. Property interests are not created by the Constitution; rather, "they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." ***Bd. of Regents of State Colleges v. Roth***, 408 U.S. 564, 577 (1972). Here, the question of whether Siler had a property interest in an administrative position comparable to his former positions is governed by Georgia law.

"Georgia law creates a property interest in continued employment for tenured teachers[10] that may not be denied without granting certain substantive and procedural due process rights." ***Hatcher***, 809 F.2d at 1550. Georgia code section 20-2-942(b)(1) provides: "[a] teacher who accepts a school year contract for the fourth consecutive school year from the same local board of education may be demoted or the teacher's contract may not be renewed only for those reasons set forth in subsection (a) of Code Section 20-2-940." O.C.G.A. § 20-2-942(b)(1). Section 20-2-940(a) outlines several acceptable reasons for

---

[10] Siler, as an administrator tenured prior to April 7, 1995, is deemed to be a "teacher" for purposes of Georgia's Fair Dismissal Law, O.C.G.A. §§ 20-2-940, *et seq.*, and this Court's due-process analysis.

demotion, including any "good and sufficient cause." O.C.G.A. § 20-2-940(a).[11] "A property interest is created by Georgia law whenever [a] teacher may be demoted or terminated only for cause." *Hatcher*, 809 F.2d at 1550 (citing **Barnett v. Hous. Auth. of Atlanta**, 707 F.2d 1571, 1576 (11th Cir. 1983)).

"In addition to the requirement that the [school] board have good cause for demoting tenured teachers, Georgia law grants a variety of procedural protections that must be provided prior to demotion." *Id.* Section 20-2-942(b)(2) requires the board to give the teacher written notice of the board's intention to demote him or her. O.C.G.A. § 20-2-942(b)(2). Following the teacher's receipt of written notice, the teacher has the right to be represented by counsel at a full hearing before the board. O.C.G.A. § 20-2-942(b)(2); O.C.G.A. § 20-2-940(b)-(f). If the board renders an adverse decision, the teacher may appeal the board's decision to the state board of education. O.C.G.A. § 20-2-940(f).

Defendants acknowledge that Siler is a tenured administrator. (Defs.' Br. 5 n.3.) Likewise, there is no dispute that Siler did not receive the procedural due process rights required for demoting a tenured administrator, although the Board may have had sufficient grounds to demote Siler. Yet, the record is unclear as to whether Siler's transfer

---

[11] The other acceptable reasons for demotion are: "(1) Incompetency; (2) Insubordination; (3) Willful neglect of duties; (4) Immorality; (5) Inciting, encouraging, or counseling students to violate any valid state law, municipal ordinance, or policy or rule of the local board of education; (6) To reduce staff due to loss of students or cancellation of programs; and (7) Failure to secure and maintain necessary educational training." O.C.G.A. § 20-2-940(a).

to the alternative school constituted a "demotion" under Georgia law. In Georgia, for an action to constitute a demotion, the subsequent position into which the educator is placed must have "less responsibility, prestige, <u>and</u> salary." O.C.G.A. § 20-2-943(a)(2)(C) (emphasis added); *see **Rockdale County Sch. Dist. v. Weil**,* 266 S.E.2d 919, 921 (Ga. 1980). Thus, before proceeding any further, the Court must decide whether the alternative school position to which Siler was transferred was one of less responsibility, prestige <u>and</u> salary than Siler's former administrative positions.

While Defendants do not concede that Siler's alternative school position was less prestigious than a principalship, or that it involved less responsibility, Defendants' primary argument is that Siler's transfer did not result in a pay decrease, and, therefore, no demotion resulted. (Defs.' Br. 25.) Siler, on the other hand, argues that his pay did decrease after his transfer to the alternative school, and claims that his first paycheck in the amount of $6,418.00 " was $454.42 less than his gross pay when he was principal of [the high school]." (Pl.'s Resp. Br. 20.)

Defendants contend that, as a result of his transfer to the alternative school, Siler actually received *an increase* in his salary. (Defs.' Br. 25; Awanna Leslie Aff. ¶¶ 6-7.) In her sworn affidavit, Awanna Leslie, the District's current Superintendent, stated she reviewed Siler's compensation records with the District from January 2002 until December 2004, and outlined the compensation Siler received during that time. (Leslie Aff. ¶¶ 3-7.) According

to Leslie, Siler's total compensation during the 2002-2003 school year was $57,400; this amount represent[ed] a daily compensation rate of $297 for a 200-day contract. (*Id.* at ¶ 4.) Between August 1, 2003 and June 30, 2004, Siler received $80,210 for serving as the "Director of the Alternative School" for 13 days (in August 2003) and as the high school's principal for 207 days (from August 2003 until June 2004). (*Id.* at ¶ 5.) Siler's 2003-2004 compensation was based on a daily rate of $365.29 for 220 days. (*Id.*) Had Siler served as principal for the entire 2003-2004 school year, he would have made $82,000 for 240 work days, at a daily rate of $341.67. (*Id.*) Between August 1, 2004 and October 4, 2004, Siler earned $18,483.84 for 46 work days, at a daily rate of $401.82 per day. (*Id.* at ¶ 6.) Had he worked the entire length of his 200-day contract, his total compensation for the 2004-2005 school year would have been $80,364.52. (*Id.*) Moreover, if Siler had remained as the high school principal in 2004-2005, he would have been subject to a district-wide reduction in the length of his contract, and would have earned an annual salary of only $75,166.67 for 220 work days, at a daily rate of $341.67. (*Id.* at ¶ 7.) In addition to Leslie's foregoing testimony regarding Siler's salary, former Superintendent Reynolds testified in her affidavit that she agreed to grant Siler a non-standard 200-day contract when he was transferred to the alternative school to "ensur[e] that he would receive no decrease in pay in his new position." (Reynolds Aff. ¶ 9.)

In response to the foregoing testimony relating to his pay, Siler offers little more than

conclusory allegations concerning what his pay would have been for the 2004-2005 school year. According to Siler, had he remained as the high school principal, he would have earned $101,987.50 during that year. (Pl.'s Resp. Br. 20.) Siler also estimates that, if he had worked as an assistant principal in 2004-2005, he would have earned $85,645. (*Id.*)

Even if the Court assumes that Siler was entitled to the same salary he earned as principal of the high school in 2003-2004 after his transfer to the alternative school, Siler's purely conjectural estimates of what he would have earned in 2004-2005 ($101,987.50, according to him) are insufficient to overcome Defendants' proof that Siler did not suffer a salary decrease when he was transferred to the alternative school. Unlike Siler's self-serving statements about the compensation he should have—but did not—receive, Leslie's testimony is supported by her review of Siler's actual compensation records, which conclusively establish that Siler received a salary increase as a result of his transfer to the alternative school. (Defs.' Br. 25.) Accordingly, because Siler is unable to establish that the alternative school position to which he was transferred was one of less "responsibility, prestige and salary," Siler was not "demoted"; thus, Defendants were not obligated to provide him with the due-process procedures for demotions outlined in O.C.G.A. §§ 20-2-940(b)-(f) and 20-2-942(b)(2).

Accordingly, Defendants' summary-judgment motion with respect to Siler's Fourteenth Amendment due-process claim is hereby **GRANTED**.

**E.      Title VII Retaliation Claim**

 In conjunction with his ADEA and other Title VII claims, Siler alleges Defendants retaliated against him for filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") by: (1) demoting him to a position with less pay, and (2) denying him a paycheck for $5,400.00 on August 31, 2004.  (Compl. ¶ 9.)

Title VII prohibits an employer from retaliating against an employee because the employee "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3.  Like other Title VII claims, retaliation claims based on circumstantial evidence are governed by the *McDonnell Douglas* burden-shifting framework.  To establish a prima facie case of retaliation, a plaintiff must show: (1) that he engaged in statutorily protected expression; (2) that he suffered an adverse employment action; and (3) that there was some causal relationship between the two events.  *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993).  If the plaintiff establishes a prima facie case, the burden "shifts to the defendant to articulate a legitimate reason for the adverse action."  *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006).  "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretexual."  *Id.*

**1. Prima Facie Case**

Siler filed an EEOC discrimination charge on or about August 4, 2004. (Defs.' Br. 30.) Defendants do not dispute that Siler's discrimination charge constitutes statutorily-protected expression. Defendants do, however, submit that Siler cannot establish a prima facie case of retaliation because Siler cannot prove that his delayed paycheck constituted an adverse employment action, nor can he demonstrate a causal connection between the filing of his EEOC charge and Defendants' allegedly retaliatory acts. (Defs.' Br. 30.) The Court will first address whether Siler can establish a causal connection between his alleged demotion and his EEOC charge. Then, the Court will analyze whether Siler's delayed receipt of his August 2004 paycheck constituted an adverse employment action.

**(a) Causal Connection**

Defendants contend that Siler cannot establish a causal link between his EEOC charge and Defendants' allegedly retaliatory acts because Siler's alleged "demotion" occurred roughly two weeks <u>before</u> Siler filed his EEOC charge. The Court agrees.

"[T]o establish the requisite 'causal link' required as part of a prima facie case, a plaintiff need only establish that 'the protected activity and the adverse action were not wholly unrelated.'" ***Goldsmith***, 996 F.2d at 1163 (11th Cir. 1993) (quoting ***EEOC v. Reichhold Chems., Inc.***, 988 F.2d 1564, 1571-71 (11th Cir. 1993)). At the same time, however, a plaintiff must, a minimum, "establish that the employer was actually aware of the protected expression at the time it took the adverse employment action." ***Id.*** (citations

33

omitted).  To prove a causal connection between an employee's protected activity and the adverse employment action, then, the employee must show that: (a) "the decision-makers were aware of the protected conduct"; and (b) "the protected activity and the adverse employment action were not wholly unrelated." *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000).

The record clearly demonstrates that Siler did not file his discrimination charge until August 4, 2004—several weeks *after* Reynolds recommended, and the District approved, Siler's appointment to the alternative school position.  Because the current record demonstrates that the relevant decision-makers were unaware of Siler's discrimination charge when Siler was appointed to the alternative school, Siler cannot establish a causal connection between the protected activity (filing of initial discrimination charge) and the adverse employment action (his alleged demotion).  Absent a demonstrated causal connection between Siler's protected activity and the adverse employment action, Siler is unable to establish a prima facie case of retaliation with respect to his alleged demotion; thus, this aspect of Siler's retaliation claim fails as a matter of law.

**(b) Adverse Employment Action**

 Defendants also contend that Siler's retaliation claim fails because he is unable to establish that the delayed receipt of his August 2004 paycheck was an "adverse employment action."  (Defs.' Br. 30.)  The Court agrees.

Title VII's "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." ***Burlington N. & Santa Fe Ry. Co. v. White***, 126 S.Ct. 2405, 2415 (2006). The level of seriousness to which this harm must rise before it becomes actionable retaliation was, prior to the Supreme Court's recent decision in ***Burlington***, a subject of spirited debate among the Courts of Appeals. *See **id**. **Burlington*** establishes that an adverse employment action is one that a "reasonable employee would have found . . . [to be] *materially adverse*, which in this context means it might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." ***Id.*** (internal citations and quotation marks omitted) (emphasis added). This "materiality" requirement underscores this Circuit's view that "[a]n action which, it turns out, had <u>no effect</u> on the employee is not an adverse action." ***Gupta***, 212 F.3d at 588. In other words, "not everything that makes an employee unhappy is an actionable adverse action." ***Doe v. Dekalb County Sch. Dist.***, 145 F.3d 1441, 1449 (11th Cir. 1998).

Siler admits that his retaliation claim is wholly based on the District's four-day delay in remitting his paycheck. (Siler Dep. 118-19.) Even assuming that Siler was entitled to an August 2004 paycheck, the Court finds that the District's four-day delay in the remittance of that check was not an "materially adverse action." The delay had no appreciable effect on Siler, and, more importantly, the delay would not have dissuaded a reasonable worker from making or supporting a charge of discrimination. Absent a showing that the

paycheck delay constituted an adverse action, or that there was a causal link between Siler's EEOC charge and his alleged demotion, Siler is unable to demonstrate a prima facie case of retaliation. Accordingly, Defendants's summary-judgment motion with respect to Siler's retaliation claim is hereby **GRANTED**.

**F.    Section 1983 Claims**

In support of his § 1983 claim, Siler merely states in his Response that: "the Hancock County School District has a pattern of discriminating against employees (Aff. of Kennedy and Wilson) with the U.S. Equal Employment Opportunity Commission." (Pl.'s Resp. Br. 35-36.) Frankly, the Court is not entirely certain as to the legal basis for Siler's § 1983 claim. The Court presumes that Siler's conclusory § 1983 argument is based on his assertion earlier in his brief that he, along with "Dr. Carol Wilson, Ms. Azzalee Askew, Ms. Sherard Kennedy, and other terminated employees that were 50 years or older" wrote letters to the EEOC, "stating that they had been discriminated against based on age." (*Id.* at 29.) To the extent that Siler is attempting to allege that Defendants had a pattern or practice of age discrimination, his conclusory assertions fall far short of the showing required to survive summary judgment on this claim.

Though age discrimination claims grounded in § 1983 of are not regarded as identical to ADEA claims, the Eleventh Circuit has held that the two causes of action share the same elements of proof and are subject to the same analytical framework. ***Burns v.***

*Gadsden State Cmty. College*, 908 F.2d 1512, 1517-18 (11th Cir. 1990). Thus, when a plaintiff asserts a § 1983 claim based on age discrimination, courts apply the same analysis to such a claim as they would an ADEA claim. More precisely, courts employ the *McDonnell-Douglas* framework. *See id.*

As discussed above, Siler has failed to prove the elements of his ADEA claim. Thus, Siler's § 1983 claim of age discrimination is similarly doomed. To the extent that Siler's allegations of a "pattern" of age discrimination represent a separate attempt to establish a prima facie case of age discrimination, *see **Buckley v. Hosp. Corp. of Am.***, 758 F.2d 1525, 1529 (11th Cir. 1985), this attempt is also rejected. A naked assertion that several former employees of the District filed age-discrimination charges with the EEOC does not amount to "statistical proof of a pattern of discrimination" by the District. *See **id.*** Accordingly, Siler's § 1983 age discrimination claim fails, and Defendants' Motion for Summary Judgment is **GRANTED** as to this claim.

## G.     State Law Claims

In addition to his numerous federal claims, Siler asserts also asserts a number of state-law claims over which this Court declines to exercise supplemental jurisdiction.

District courts have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C.A. § 1331. District courts have supplemental jurisdiction over all other claims, including state-law claims, that are

"so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C.A. § 1367(a). A district court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction. . . ." 28 U.S.C.A. § 1367(c). When deciding whether to exercise supplemental jurisdiction over a state-law claim, a district court should consider, among other factors, "judicial economy, convenience, fairness and comity." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1288 (11th Cir. 2002) (noting "the argument for dismissing state law claims in order to allow state courts to resolve issues of state law is even stronger when the federal law claims have been dismissed prior to trial").

Considering the nature of Siler's state-law claims and the stage at which his federal claims have been dismissed, the Court finds the above-listed factors counsel against retaining supplemental jurisdiction over his state-law claims. Accordingly, Siler's state-law claims are **DISMISSED WITHOUT PREJUDICE**.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (doc. 72) is

hereby **GRANTED**.

SO ORDERED, this 27th day of March, 2007.


S/  C. Ashley Royal
C. ASHLEY ROYAL, JUDGE
UNITED STATES DISTRICT COURT

JAB/aeg